IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| DARLA K. BURRELL,<br><br>    Plaintiff,<br><br>vs.<br><br>UTAH DEPARTMENT OF<br>WORKFORCE SERVICES,<br><br>    Defendant. | MEMORANDUM DECISION AND<br>ORDER<br><br><br>Case No. 1:06-CV-00091DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant Utah Department of Workforce Services (DWS) Motion for Summary Judgment.[1] The court held a hearing on the motion on January 25, 2008. At the hearing, Michael P. Studebaker represented Plaintiff Darla K. Burrell and Akiko Kawamura represented DWS. Following the hearing, the court took the matter under advisement. Now, having carefully considered the memoranda and additional materials submitted by the parties, as well as the relevant law and facts relating to the motion, the court renders the following Memorandum Decision and Order.

---

[1] DWS also moves to strike Burrell's Affidavit on grounds that the affidavit conflicts with Burrell's deposition testimony, contains legal conclusions, and contains statements lacking evidentiary foundation. The court has carefully reviewed Burrell's Affidavit and determined that the affidavit does not contain evidence, even if admitted, that alters the court's decision in this case. The court therefore denies DWS's Motion to Strike as moot.

**BACKGROUND**

DWS hired Burrell, an African-American woman, in August 2001. From the time of her employment until her July 2002 termination, Burrell was a probationary employee.

During her employment with DWS, Burrell worked as an eligibility specialist. DWS eligibility specialists are responsible for determining whether individuals are eligible for child care, medical, and food stamp benefits. As an eligibility specialist, Burrell was responsible for meeting federally imposed accuracy benchmarks in her calculation of benefits to individuals. According to Kathy Kirby, Burrell's direct supervisor, accuracy in benefit determinations is important because the individuals applying for benefits are below the poverty level. Thus, underpayment results in these individuals receiving lower benefits than needed, and overpayment forces these individuals to repay any surplus received back to the state of Utah. At the time of Burrell's termination, DWS was on a corrective plan for failing to meet federal accuracy standards.

DWS eligibility specialists work in teams of ten to twelve employees. In January 2002, DWS assigned Burrell to Kirby's team. At the time, there were two additional probationary employees on Kirby's team. Each probationary employee was assigned to a mentor who edited the probationary employee's cases. Kirby described the editing process as constituting a review and refinement of a specific action taken on a case, such as changing income or shelter expenses. According to Kirby, the editing process does not involve a complete edit of the employee's work.

At some point during Burrell's employment with DWS, Kirby subjected all three

probationary employees on Kirby's team to 100% edits, meaning the employees submitted 100% of their cases to their mentor for editing. During her entire eleven-month employment with DWS, Burrell underwent 100% edits. One probationary employee also underwent 100% edits for an extended period of time, but Kirby removed this individual from 100% edits after he achieved 100% accuracy for two months.

According to Harold Hess, the Regional Director for the North Region Eligibility Centers of DWS, for employees to successfully complete their twelve-month probationary period, they have to meet the accuracy standards consistently, i.e., every month. DWS recognizes a training curve for eligibility specialists, and eligibility specialists' accuracy percentage benchmarks increase commensurate with months of experience.

During Burrell's time on Kirby's team, Kirby required Burrell to meet with her one to two times a week to discuss Burrell's performance and accuracy issues. Kirby memorialized her meetings with Burrell on the following dates: January 7, 2002; February 28, 2002; April 9, 2002; May 14, 2002; June 3, 2002; and June 14, 2002. Kirby's February 28, 2002 notes indicate that Burrell was "having trouble staying caught up." On April 9, 2002, Kirby wrote that she and Burrell discussed Burrell's food stamp accuracy, and on May 14, 2002, Kirby noted that Burrell's "accuracy [was] not at allowable limit."

On May 13, 2002, DWS gave Burrell a letter (the Warning Letter), warning her that she was not meeting the food stamp accuracy standards for an employee with eight months of experience. Burrell's food stamp accuracy for April and May was at 80%. The Warning Letter further noted that Burrell's accuracy percentage standards would increase with her ninth month of probation and that Burrell had thirty days to increase her food stamp accuracy level to 92%.

On June 6, 2002, DWS administered a food stamp skills test to seven employees. Burrell received ten out of twenty-three points on this test. This was the lowest score. Kirby's June 14, 2002 notes indicate that Burrell's food stamp accuracy was at 82%.

In early June 2002, Burrell made an appointment to speak with Hess. At this meeting, Burrell complained that Kirby was editing Burrell's work too tightly and more strictly than other members of the team. Hess testified that Kirby was a demanding supervisor and that other employees had complained about her high standards. One probationary employee, who was Caucasian and who was also terminated during her probationary period, had also complained to Hess about Kirby's managerial style.

During the meeting, Hess reviewed Burrell's eligibility edit sheets. Based on that review, Hess independently concluded that Burrell was having difficulties keeping up with the accuracy and workload requirements. Hess therefore determined that Kirby's decision to subject Burrell to strict editing was appropriate. Hess, however, did agree to let Burrell process 10% fewer cases than other probationary employees, to see if the lower caseload would help Burrell meet performance requirements. Hess met with Burrell on two subsequent dates, reviewed her eligibility edit sheets, and concluded that even with a caseload reduction, Burrell was failing to meet performance standards.

During this initial meeting with Hess, Burrell also informed him that Kirby and another supervisor, Virginia Sugihara, were discriminating against her. Burrell told Hess that during her childhood she lived next door to Sugihara and that Sugihara would tell Burrell's mom to "get those little niggers off my fence." Burrell also informed Hess that Sugihara would allow Burrell's sister, who was Caucasian, to play with Sugihara's daughter, but she would make

Burrell wait outside.

One month prior to her termination, Burrell's food stamp accuracy was 82%. In the weeks following the Warning Letter, up until her July termination date, Burrell's food stamp accuracy percentages ranged from 78% to 100%. On June 21, 2002, Sugihara issued Burrell an accuracy award. At some point in the course of her employment, Burrell also received a performance bonus award.

DWS terminated Burrell on July 17, 2002. The individuals involved in the termination decision were Kirby, Hess, Sugihara, Burrell's mentor, and the DWS Human Resources Specialist. DWS contends that it discharged Burrell for substandard performance, specifically Burrell's failure to achieve the prescribed accuracy benchmarks. Burrell stated that following her termination, she overheard her mentor tell another probationary employee on Kirby's team that the mentor guessed she no longer had to do this employee's edits anymore.

On August 11, 2006, Burrell filed suit in federal district court, alleging that DWS unlawfully terminated her on the basis of race and took retaliatory actions against her. Burrell seeks money damages for back wages, loss of retirement income, and loss of benefits.

On September 27, 2007, DWS moved for summary judgment, arguing that DWS had demonstrated legitimate, nondiscriminatory reasons for discharging Burrell, and that Burrell had failed to proffer any evidence of racial discrimination or retaliation. In her Motion in Opposition to Summary Judgment, Burrell admits that neither Kirby, nor anyone else at DWS, made racially charged, threatening, or belittling comments to her. But Burrell alleges that Kirby's body language was threatening, and Kirby discriminated against her on the basis of race by sending her weekly emails informing her that she would not make it out of probation if she did not

increase her accuracy percentages; by requiring biweekly meetings to discuss Burrell's accuracy percentages; by submitting Burrell's work to 100% edits; by administering the food stamp skills test; and by denying Burrell the opportunity to attend a meeting with Hess on grounds that Burrell "ha[d] talk[ed] to [Hess] enough already." Burrell further claims that Kirby had a "pattern" of discriminating against employees. When asked who else had been singled out for discrimination by Kirby, Burrell identified a Caucasian female employee.

## DISCUSSION

In her Complaint, Burrell alleges DWS violated Title VII in unlawfully discharging her on the basis of race and engaging in retaliatory actions against her. *See* 42 U.S.C. § 2000e-2(a)(1); -3(a). DWS disputes this claim and moves for summary judgment on grounds that DWS has evidenced legitimate, nondiscriminatory reasons for Burrell's discharge and Burrell has proffered no evidence of racial discrimination or retaliation.

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment is appropriate if the record shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *True v. United States*, 190 F.3d 1165, 1171 (10th Cir. 1999) (quoting Fed. R. Civ. P. 56(c)). Under this standard, "[a] fact is 'material' if under the substantive law it could have an effect on the outcome of the lawsuit." *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000). "An issue is 'genuine' if 'a rational jur[or] could find in favor of the nonmoving party on the evidence presented.'" *Id*. (alteration in original) (quoting *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000)). In reviewing a motion for summary judgment, the court "view[s] the factual record and

draw[s] any reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id*.

### I. Title VII Discrimination Claim

DWS moves for summary judgment on Burrell's claim that DWS unlawfully discriminated against her by terminating her on the basis of race. Pursuant to Title VII, an employer is prohibited from discharging an employee on grounds of race. *See* 42 U.S.C. § 2000e-2(a)(1).

A plaintiff bringing a Title VII race discrimination claim may prove intentional discrimination by direct or indirect—"i.e., circumstantial"—evidence. *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1225 (10th Cir. 2000). "'Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'" *Hall v. United States Dep't of Labor*, 476 F.3d 847, 854 (10th Cir. 2007) (quoting *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1207 (10th Cir. 1999)). "Direct evidence requires 'proof of an existing policy which itself constitutes discrimination,' or 'oral or written statements on the part of a defendant showing a discriminatory motivation.'" *Id*. at 854-55 (citations omitted). "Statements of personal opinion, even when reflecting personal bias or prejudice, do not constitute direct evidence of discrimination, but at most, are only circumstantial evidence of discrimination because the trier of fact must infer discriminatory intent from such statements." *Id*. at 855; *see also EEOC v. Wiltel, Inc.*, 81 F.3d 1508, 1514 (10th Cir. 1996) (explaining that "[b]ecause . . . statements [of personal opinion] require the trier of fact to infer that discrimination was a motivating cause of an employment decision, they are at most

circumstantial evidence of discriminatory intent").

Here, Burrell contends that the following events constitute direct evidence of discrimination: Sugihara's racist comments during Burrell's childhood; Burrell's requisite weekly meetings with Kirby; Burrell's subjection to 100% edits; Burrell's subjection to a ninety-two percent food stamp accuracy level; and Burrell's alleged improper score on the food stamp test. None of these events, however, satisfy the Tenth Circuit's criteria for direct evidence. *See Hall*, 476 F.3d at 854-55. The weekly meetings, 100% edits, 92% accuracy standard, and alleged improper scoring do not demonstrate that DWS had a policy of discriminating against African-Americans, and Sugihara's purported comments during Burrell's childhood, albeit reprehensible, constitute statements of personal opinion. *See Wiltel*, 81 F.3d at 1514 (listing several cases in which "expressions of personal opinion or bias d[id] not constitute direct evidence of discriminatory intent," including a case where a manager remarked "'I hate having fucking woman in the office'" and a case where a manager told the plaintiff-employee that he "could not be promoted because 'he was too damned old'" (citations omitted)). Furthermore, as DWS points out, Burrell fails to demonstrate a nexus between Sugihara's statements, made years prior, and DWS's decision to terminate her. *See McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 n.3 (10th Cir. 2001) ("When a plaintiff alleges that discriminatory comments constitute direct evidence of discrimination, . . . the plaintiff must demonstrate a nexus exists between the allegedly discriminatory statements and the decision to terminate her." (quotations and citation omitted)).

Accordingly, in cases "[w]here, as here, an employee's [race] . . . discrimination claim relies exclusively on circumstantial, rather than direct, evidence, [the court] appl[ies] the burden-

shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 [1973]." *Timmerman v. United States Bank N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007); *see also English v. Colorado Dep't of Corrections*, 248 F.3d 1002, 1007 (10th Cir. 2001) (explaining that the court "review[s plaintiff's] case for indirect evidence of racial discrimination under the burden-shifting approach established by *McDonnell Douglas*"). Under the *McDonnell Douglas* framework, the plaintiff "bears an initial burden of establishing a prima facie case intended to eliminate the most common nondiscriminatory reasons that might account for the adverse employment action." *English*, 248 F.3d at 1008. If the plaintiff "establish[es] a prima face case, the burden then 'shift[s] to the employer to articulate some legitimate, nondiscriminatory reason' for taking an adverse employment action against the plaintiff." *Id.* (second alteration in original) (quoting *McDonnell Douglas*, 411 U.S. at 802). "The employer's articulation of a legitimate, nondiscriminatory reason for the adverse employment action causes the presumption of discrimination attendant to the prima facie showing of discrimination 'to simply drop[] out of the picture.'" *Timmerman*, 483 F.3d at 1113 (alteration in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). Thus, if the employer "successfully meets its burden of production, the burden shifts back to the plaintiff to put forth evidence sufficient to allow a jury to find that the defendant's reason [for the adverse employment action] is pretextual, e.g., that it is unworthy of belief." *English*, 248 F.3d at 1008 (emphasis omitted). A successful showing of pretext "enables a plaintiff to survive summary judgment." *Timmerman*, 483 F.3d at 1113. A plaintiff must prove both her prima facie case and pretext by a preponderance of the evidence. *See Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1307 (10th Cir. 2005) (*en banc*) (*per curiam*) (pretext); *EEOC v. Horizon*, 220 F.3d 1184, 1191 (10th Cir. 2000) (prima facie case).

**A.     Burrell's Prima Facie Case**

For a plaintiff to satisfy his or her prima facie burden in a discriminatory discharge case, the plaintiff must show that "'(1) [s]he belongs to a protected class; (2) [s]he was qualified for [her] job; (3) despite [her] qualifications, [s]he was discharged; and (4) the job was not eliminated after [her] discharge.'" *English*, 248 F.3d at 1008 (quoting *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1229 (10th Cir. 2000) (holding that in discriminatory discharge cases, it is not necessary for a plaintiff to show that he was treated less favorably than those outside the protected class to satisfy prima facie burden)).

Here, the parties do not dispute that Burrell is a member of a protected class. As to the question of whether DWS eliminated Burrell's position following her discharge, the parties provide no information. But DWS's claim that it discharged Burrell for poor performance suggests "that there is sufficient evidence in the record to find [Burrell] was not terminated because of a workplace reduction," *id*., and more significantly, the Tenth Circuit recently held that in discriminatory discharge cases, the status of the employee's former position is irrelevant if the employer's reason for termination is unsatisfactory conduct, *see Plotke v. White*, 405 F.3d 1092, 1100 (10th Cir. 2005).

The parties do contest, however, whether Burrell has demonstrated that she was qualified for her position. Specifically, DWS contends that Burrell cannot "sustain the second prong of the test because she was not performing satisfactory work," i.e., "in the eleventh month of her probation, Burrell still failed to meet the accuracy benchmark for assessing food stamp

eligibility."

But the Tenth Circuit has made clear that courts should not "consider a defendant's proffered reason[] for discharge in assessing the existence of a prima facie case." *MacDonald v. E. Wyoming Mental Health Ctr.*, 941 F.2d 1115, 1119 (10th Cir. 1991). In *MacDonald*, "as here, the employer's argument that the plaintiff was not qualified was supported by the reasons offered for h[er] discharge." *Id*. The *MacDonald* court rejected this approach, noting that in satisfying the qualification prong of the prima facie case, the court adheres to "the principle that the prima facie case was 'never intended to be rigid, mechanized, or ritualistic.'" *Id*. at 1121 (quoting *Smith v. Gen. Scanning, Inc.*, 876 F.2d 1315, 1319 (7th Cir. 1989) (additional quotations and citation omitted). Instead, the court held that

> a plaintiff may make out a prima facie case of discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she held her position for a significant period of time.

*Id*. (citations omitted).

Here, Burrell testified that her work was satisfactory and points to her receipt of an accuracy award, a performance bonus, and several food stamp accuracy rates exceeding ninety-two percent after issuance of the Warning Letter. Accordingly, the court concludes that Burrell has satisfied the qualification prong and satisfied her burden as to a prima facie case.

**B.     DWS'S Burden**

Because the court concludes that Burrell has established a prima facie case, the burden "'shift[s] to [DWS] . . . to articulate some legitimate, nondiscriminatory reason' for taking an

11

adverse employment action against [Burrell].'"  *English v. Colorado Dep't of Corrections*, 248 F.3d 1002, 1008 (10th Cir. 2001) (first alteration in original) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  The court determines that DWS has "met its burden by asserting that it terminated [Burrell] because she failed to meet the performance criteria established for her position."  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005).  "Poor performance is a quintessentially legitimate and nondiscriminatory reason for termination."  *Id*.

**C.     Pretext**

DWS having articulated a legitimate, nondiscriminatory reason—i.e., substandard performance—for Burrell's discharge, the burden shifts back to Burrell to "show that . . . [DWS's] justification is pretextual."  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000).  Burrell's "[f]ailure to come forward with evidence of pretext will entitle [DWS] to [summary] judgment."  *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 529 (10th Cir. 1994); *see also Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007) ("Demonstrating pretext enables a plaintiff to survive summary judgment.").

"Pretext exists when an employer does not honestly represent its reasons for terminating an employee."  *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).  A plaintiff can show pretext by evidencing "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief."  *Timmerman*, 483 F.3d at 1113 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

Importantly, in evaluating pretext, the court "look[s] at the facts as they appear to the person making the decision to terminate plaintiff." *Kendrick*, 220 F.3d at 1231. Thus, "the 'relevant inquiry is not whether [DWS's] proffered reasons were wise, fair[,] or correct, but whether [DWS] honestly believed those reasons and acted in good faith upon those beliefs.'" *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) (citation omitted). It is well established that "when analyzing the pretext issue, [courts] do not sit as 'super-personnel departments.'" *Bullington v. United Airlines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) (additional quotations and citation omitted). The court's "role is not to second guess an employer's business judgment." *Stover*, 382 F.3d at 1076; *see also Young v. Dillon Companies, Inc.*, 468 F.2d 1243, 1250 (10th Cir. 2006) (explaining that court's role is not to "second guess[] employers' honestly held (even if erroneous) business judgments").

Here, the court concludes that Burrell fails to demonstrate pretext. DWS's proffered evidence reveals that both Kirby, Burrell's direct supervisor, and Hess, the regional supervisor, independently reviewed Burrell's work and both testified that Burrell's work was unsatisfactory; that Kirby's performance reviews reflect concerns with Burrell's work beginning as early as five months prior to Burrell's discharge; that prior to her discharge, Burrell received the lowest score on a skills test; and that Burrell's foodstamp accuracy after the Warning Letter was sporadic, ranging from 78% to 100%.

In response to this evidence, Burrell first argues that because she received an accuracy award, a performance bonus, and several adequate accuracy percentages after the Warning Letter, DWS's "claims about [Burrell's] employment and work . . . and the defense about her

13

being an unfit employee . . . lack merit and are not correct." Second, Burrell notes that DWS's reliance on her food stamp test score was improper because she claims the test was incorrectly scored. Finally, Burrell maintains that in subjecting her to 100% edits and a 92% accuracy standard, DWS treated Burrell less favorably than similarly situated employees.

Significantly, however, in showing pretext, Burrell's burden goes beyond the mere proffering of documents showing a recognition by DWS that Burrell had occasionally performed at or above expectations. As noted, it is not sufficient for Burrell to merely show that a factfinder could dispute DWS's assessments of Burrell's job performance. *See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138 (10th Cir. 2004) ("To show pretext . . . [i]t is not enough that a factfinder could disagree with the employer's assessments."); *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 747 (10th Cir. 1991) (stating that a plaintiff cannot show pretext "by merely challenging in general terms the accuracy of a performance evaluation which the employer relied on in making an employment decision"). Instead, Burrell must identify evidence indicating that DWS itself did not honestly believe that Burrell's poor job performance precipitated her discharge, or that DWS arrived at its belief in bad faith. *See Exum*, 389 F.3d at 1137 ("To show pretext, the plaintiff must call into question the honesty or good faith of the [employer's] assessment of his abilities."); *see also Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) ("[A]rguing about the accuracy of the employer's assessment is a distraction, because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." (emphasis, additional quotations, and citation omitted)).

As for Burrell's own testimony as to her satisfactory job performance, it is well

established that Burrell's opinion as to her job performance is irrelevant. *See Kelley v. Goodyear Tire & Rubber Co.*, 220 F.3d 1174, 1177-78 (10th Cir. 2000) ("[I]t is the manager's perception of the employee's performance that is relevant [in pretext determinations], not plaintiff's subjective evaluation of his own relative performance." (quotations and citation omitted)); *Bullington*, 186 F.3d at 1318 ("[The plaintiff's] own opinions about her qualifications do not give rise to a material fact dispute.").

Lastly, although an employee "may . . . show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness," *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000), Burrell fails to point to any record evidence indicating that other probationary employees on Kirby's team did not have to meet accuracy benchmarks or that other probationary employees on Kirby's team who, like Burrell, consistently failed to meet accuracy benchmarks were treated differently.[2] Furthermore, Burrell fails to rebut DWS's assertion that it subjected Burrell to 100% edits because, unlike other probationary employees on Kirby's team, Burrell failed to consistently meet accuracy rate benchmarks. As noted by the Tenth Circuit, "Differences in treatment that are trivial or accidental *or explained by a nondiscriminatory motive* will not sustain a claim of pretext." *Id*.

In conclusion, Burrell has offered no evidence to rebut DWS's evidence that it terminated

---

[2] For purposes here, the court assumes, without deciding, that the other probationary employees on Kirby's team qualify as similarly situated nonprotected employees. "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)).

Burrell for deficient performance and has failed to demonstrate a genuine issue of material fact as to pretext. The court therefore grants DWS's Motion for Summary Judgment as to Burrell's Title VII discrimination claim.

## II. Title VII Retaliation Claim

DWS also moves for summary judgment on Burrell's claim that DWS engaged in retaliatory acts against Burrell for complaining about the alleged racial harassment she was allegedly enduring. Pursuant to Title VII, an employer is prohibited from retaliating against an employee because she "has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000(e)-3(a).

Because Burrell sets forth no direct evidence of retaliation, the court applies the burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to her retaliation claim. *See Proctor v. United States Parcel Service*, 502 F.3d 1200, 1207 (10th Cir. 2007).

> [Under] this framework, if [the employee] establishes a prima facie case of retaliation, the burden shifts to [the employer] to assert a legitimate, nondiscriminatory reason for the adverse action. . . . [If this occurs], the burden shifts back to [the employee] to show that [the employer's] proffered reason is a "pretext masking discriminatory animus."

*Id*. (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir. 2007)).

Although not detailed by Burrell in her analysis, to establish a prima facie case of retaliation, Burrell must show "'(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and

16

(3) that a causal connection existed between the protected activity and the materially adverse action.'" *Id*. (quoting *Argo v. Blue Cross & Blue Shield*, 452 F.3d 1193, 1202 (10th Cir. 2006)). Although Burrell's failure to expressly apply the prima facie case makes it somewhat difficult to discern those acts she contends were retaliatory, it appears that the "numerous forms of retaliation" Burrell alleges are being mocked by Kirby in front of other employees, being unfairly singled out by Kirby for 100% edits, and being terminated by DWS. Again, although not apparent, Burrell seems to allege that the protected activity was speaking to Hess in June about the purported discrimination.

First, this court notes that "[I]t is not the job of the court to construct a party's arguments for him." *Trugreen Companies, LLC v. Scotts Lawn Serv.*, 508 F. Supp. 2d 937, 952 (D. Utah 2007). Second, although "voicing informal complaints to superiors" can constitute protected opposition, *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004), Burrell gives no support or explanation for her contention that the alleged mocking was a materially adverse action. *See Proctor*, 502 F.3d at 1208 n.4 (explaining that in retaliation cases the court uses a reasonable employee standard to decide whether an action is materially adverse, i.e., "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)); *see also Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) (providing that "unnecessary derogatory comments" are not in themselves materially adverse employment actions). Furthermore, Burrell's allegation that her subjection to strict editing was in retaliation for her meeting with Hess is without merit because she had been subjected to strict editing for five months prior to the meeting. *See Proctor*, 502 F.3d at 1210 n.5 (noting that the occurrence

of action both before and after protected activity undermines inference of retaliation).  Finally, although DWS concedes termination is a materially adverse action, *see id.*, Burrell has failed to state any causal connection between her meeting with Hess and her discharge.

Even assuming Burrell has established a causal connection, *see Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (noting "that a one and one-half month period between protected activity and adverse action may, by itself, establish causation"), and demonstrated a prima facie case, she fails to explain, much less demonstrate, that DWS's proffered reason for her discharge was a pretext for retaliation.  *See Proctor*, 502 F.3d at 1209 (stating that an employee can show pretext by demonstrating "evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons" (quotations and citation omitted)).

In short, this court determines that Burrell has failed to raise a genuine issue of material fact as to retaliation.  The court therefore grants DWS's Motion for Summary Judgment as to Burrell's Title VII retaliation claim.

## CONCLUSION

DWS's Motion for Summary Judgment is GRANTED.  The court dismisses Burrell's claims with prejudice and orders each party to bear their own costs.

DATED this 5th day of February, 2008.

BY THE COURT:

/s/ Dale A. Kimball

DALE A. KIMBALL

United States District Judge